SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
PHILIP F. ATKINS-PATTENSON, Cal. Bar No. 94901
ARTHUR J. FRIEDMAN, Cal. Bar No. 160867
JAMES F. RUSK, Cal. Bar No. 253976
ALEXANDER L. MERRITT, Cal. Bar No. 277864
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email        patkinspattenson@sheppardmullin.com
             afriedman@sheppardmullin.com
             jrusk@sheppardmullin.com
             amerritt@sheppardmullin.com

Attorneys for PLAINTIFFS YCS
INVESTMENTS, YOUNGSVILLE
DEVELOPMENT, INC., YOUNGSVILLE
HOLDINGS, INC., AND EDENVALE
HOLDINGS, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| YCS INVESTMENTS, YOUNGSVILLE DEVELOPMENT, INC., YOUNGSVILLE HOLDINGS, INC., AND EDENVALE HOLDINGS, INC.,<br><br>        Plaintiffs,<br><br>     v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE; DAVID BERNHARDT, in his official capacity as Acting Secretary of the United States Department of the Interior; and MARGARET EVERSON, in her official capacity as Acting Director of the United States Fish and Wildlife Service,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

SMRH:485016877.8

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs YCS Investments, Youngsville Development, Inc., Youngsville Holdings, Inc., and Edenvale Holdings, Inc. (collectively, **YCS**) submit this Complaint against Defendants United States Fish and Wildlife Service (**Service**), David Bernhardt, in his official capacity as acting Secretary of the United States Department of the Interior; and Margaret Everson, in her official capacity as acting Director of the Service, and state and allege as follows:

**INTRODUCTION**

1.      The Service adopted a habitat conservation plan under section 10 of the Endangered Species Act (**ESA**) that requires acquisition and management of hundreds of acres of valuable habitat within the YCS-owned Young Ranch property to achieve the plan's conservation objectives.  The Service arbitrarily assumed that Young Ranch would somehow be available for conservation consistent with the plan.  However, preservation and active management of the high-quality habitat at Young Ranch is economically feasible only if YCS has the opportunity to develop the 10 percent of the property that lacks such habitat.  The County of Santa Clara (**County**) has made it clear that it will not allow even this limited development necessary to facilitate the plan's conservation goals.  Therefore, the Service's approval of the Plan was based on a flawed assumption and is unlawful, and the Service must reinitiate consultation under ESA section 7 to reconsider its approval of the plan in light of the information showing that the plan's conservation strategy cannot be fully implemented.

2.      On July 30, 2013, the Service issued Incidental Take Permit No. TE94345A-0 (**ITP**) under section 10(a)(1)(B) of the ESA, 16 U.S.C. § 1539(a)(1)(B), authorizing incidental take of the bay checkerspot butterfly (**BCB**) and other ESA-listed species in connection with implementing the Santa Clara Valley Habitat Conservation Plan (**Plan**).  The Plan covers an area of approximately 460,205 acres in Santa Clara County, California, including the 2,150-acre Young Ranch property owned by YCS.

3.      The Plan and ITP authorize various activities within the Plan area that will adversely affect BCB and other listed species, and their designated critical habitat,

including urban and rural land development, capital projects, operations and maintenance of those projects, and implementation of conservation measures for covered species (collectively, the **Covered Activities**).

4.     To mitigate the effects of Covered Activities on listed species and their habitat, the Plan relies on a conservation strategy that calls for acquisition and management of tens of thousands of acres of land containing habitat for listed species, and preservation of important connections between key habitat areas.  The Plan establishes specific numeric requirements for acquisition of various habitat types, including the serpentine grassland habitat that supports BCB, and other mandatory conservation objectives.  These include acquisition and management of serpentine grassland habitat along the area known as Coyote Ridge, which contains *all* remaining core populations of BCB; establishment of a habitat and movement corridor along Coyote Ridge called Linkage 6, connecting those BCB core populations; and actions to ensure BCB will continue to occupy each of the four BCB core habitat areas along Coyote Ridge.

5.     Young Ranch occupies a crucial location on Coyote Ridge.  It contains some of the highest quality BCB habitat in existence and is home to the most robust extant BCB population.  As a result, incorporating the majority of Young Ranch into the Plan's habitat Reserve System is essential to meeting several of the Plan's mandatory conservation objectives for BCB, including establishing Linkage 6 and ensuring that BCB core habitat areas remain occupied.

6.     Before issuing the ITP, the Service prepared a biological opinion dated April 10, 2013, File No. 81420-2009-F-0077, as required by section 7 of the ESA, 16 U.S.C. § 1536, to analyze the effects of the Covered Activities on listed species and their critical habitat (**Biological Opinion**).  The Biological Opinion concludes that, taking into account the conservation measures proposed as part of the Plan and required by the ITP, issuing the ITP is not likely to jeopardize the continued existence of any listed species, including BCB, or to result in the destruction or adverse modification of critical habitat for such species.  The Biological Opinion assumes, and the ITP requires, that the ITP permittees

will fully implement the Plan's conservation strategy and that the habitat acquisition targets and other conservation objectives of the Plan will be met.

7.     The Service's issuance of the Biological Opinion and approval of the ITP were arbitrary and capricious, and violated the ESA's "best available science" and "no jeopardy" mandates, because the analysis in the Biological Opinion (*i*) relies on flawed habitat modeling that overstates the amount and value of the habitat available for conservation, (*ii*) unreasonably assumes that key properties, including Young Ranch, will be available to meet the Plan's mandatory conservation goals, thereby relying on speculative mitigation measures, and (*iii*) incorporates a flawed assessment of indirect impacts to BCB and other serpentine grassland species from nitrogen deposition. The Service also failed to ensure the Plan will be adequately funded, as required by ESA section 10, because its analysis underestimates the cost of acquiring conservation lands and relies on funding sources that are likely to be reduced or eliminated.

8.     In addition to its unlawful issuance of the Biological Opinion and ITP in 2013, the Service has also violated ESA section 7 and its implementing regulations, including 50 C.F.R. § 402.16, by failing to reinitiate consultation regarding its approval of the ITP in light of significant new information. The Plan contains several mandatory conservation objectives that cannot be met without incorporating the majority of Young Ranch into the Plan's habitat Reserve System. YCS has provided the Service with new information demonstrating that actions taken by the County have made Young Ranch unavailable for inclusion in the Reserve System. This information calls into question the Biological Opinion's conclusions that the Plan's conservation strategy will adequately mitigate the impacts of Covered Activities, and that Plan activities will not jeopardize the continued existence of the BCB or other listed species, and the Service's findings that the Plan will not appreciably reduce the likelihood of the survival and recovery of BCB and other covered species in the wild.

9.     Despite this new information, the Service has failed to reinitiate consultation on its approval of the ITP, as required by law.

10.     The Service's actions are arbitrary and capricious and contrary to law.  Its approval of the ITP must be set aside until the Service has corrected the flaws in the Plan and Biological Opinion, and reinitiated consultation to consider the effects of its action in light of the new information showing that Young Ranch is unavailable for inclusion in the Plan's Reserve System.

### JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question), 16 U.S.C. § 1540(c), (g) (actions arising under the citizen suit provision of the ESA); and 5 U.S.C. § 702 (judicial review of agency action under the Administrative Procedure Act (**APA**), 5 U.S.C. § 551, *et seq.*).

12.     The United States has waived sovereign immunity in this action and authorized judicial review under the ESA, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. §§ 702, 704, and 706. The Service's approval of the ITP and HCP is final agency action under the APA.

13.     YCS satisfied the notice requirement of the ESA citizen suit provision, 16 U.S.C. § 1540(g)(2). More than 60 days ago, by letter dated February 6, 2019, YCS provided Defendants written notice of the violations that are the subject of this complaint. The notice is attached as Exhibit 1 and is incorporated herein by reference.  Defendants did not respond to the notice.  Defendants have not taken any action to remedy Defendants' violations of law.

14.     The requested declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201–2202 and/or 16 U.S.C. § 1540(g)(1)(A).

15.     YCS has exhausted its administrative remedies and is not required to pursue additional administrative remedies before seeking and obtaining judicial relief.

16.     An actual, justiciable controversy has arisen and now exists between the parties with regard to Defendants' violations of the statute and regulations cited herein.

17.     Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) because Defendants' violations of the ESA occurred in this district, and under 28 U.S.C. § 1391(e)

1   because a substantial part of the events or omissions giving rise to the claim occurred, and

2   the property that is the subject of the action is situated, in this district, or, in the alternative,

3   because Plaintiff YCS Investments resides in this district.

4   **PARTIES**

5      18.      Plaintiffs Youngsville Development, Inc., Youngsville Holdings, Inc., and

6   Edenvale Holdings, Inc. are the owners of that certain real property, consisting of

7   approximately 2,150 contiguous acres in the unincorporated County and the City of San

8   Jose (**City**), within the Plan area, commonly known as "Young Ranch."

9      19.      Plaintiff YCS Investments is a corporation organized under the laws of

10  California, with its principal place of business in San Francisco, California. YCS is the

11  duly authorized agent to act on behalf of Plaintiffs Youngsville Development, Inc.,

12  Youngsville Holdings, Inc., and Edenvale Holdings, Inc., and is the designated manager

13  and developer of the Young Ranch property.

14     20.      YCS has managed the Young Ranch property for many years, at an

15  economic loss, to ensure the conservation of the BCB and its habitat, and of other sensitive

16  wildlife species, plant species, and other biological resources present on the property.

17  YCS's management of the property has included cattle grazing at carefully managed

18  stocking levels to control nonnative plant species and maintain the serpentine grassland

19  habitat that BCB depends upon.

20     21.      YCS has undertaken extensive, multi-year biological surveys, monitoring

21  and studies of the BCB populations and BCB habitat on Young Ranch, and of other

22  valuable resources found on the property, and has shared the results of those studies with

23  the Service and other agencies to inform the development of the Plan.  The Service's

24  arbitrary and capricious approval of the ITP and Plan, and the Service's failure to reinitiate

25  consultation on the Plan, adversely affect YCS's interest in the conservation of the BCB,

26  its habitat, and other sensitive resources affected by the Plan.

27     22.      The inclusion of the Young Ranch property within the Plan area, and the

28  issuance of the ITP, impose significant regulatory burdens on the property such that all

1   development approvals issued by the County, the City or other Plan permittees must

2   comply with the Plan's restrictions and the terms and conditions of the ITP, including

3   limitations on authorized impacts to various habitat types and sensitive species within the

4   overall Plan area.  These restrictions limit YCS's use of the Young Ranch property and

5   adversely affect the value of the property.

6        23.    Defendant David Bernhardt is the acting Secretary of the United States

7   Department of the Interior (**Secretary**).  Congress has charged the Secretary with

8   administering the ESA, which responsibilities include conducting consultations pursuant to

9   ESA section 7, 16 U.S.C. § 1536, and issuing permits to authorize incidental take of ESA-

10   listed species pursuant to ESA section 10(a), 16 U.S.C. § 1539(a).  The Secretary is

11   responsible for supervising the various federal agencies and bureaus within the Department

12   of the Interior, including the Service.  Mr. Bernhardt is an officer or employee of the

13   United States and has a direct statutory duty to carry out the provisions of the ESA and

14   other relevant laws. Mr. Bernhardt is sued in his official capacity only.

15        24.    Defendant United States Fish and Wildlife Service is an agency of the United

16   States Department of the Interior. The Secretary has delegated responsibility for day-to-

17   day administration of the ESA, including conducting consultations and issuing incidental

18   take permits, to the Service.

19        25.    Defendant Margaret Everson is the Principal Deputy Director of the Service,

20   exercising the authority of the Director.  Ms. Everson oversees the Service's administration

21   of the ESA.  She is sued in her official capacity only.

## STATUTORY FRAMEWORK

### Habitat Conservation Plans

24        26.    Section 9 of the ESA and its implementing regulations prohibit the

25   unauthorized "take" of species listed as endangered or threatened under the ESA.  16

26   U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31.  Take that complies with the terms and conditions

27   specified in a biological opinion and incidental take statement prepared under ESA

28   section 7, or an incidental take permit issued under ESA section 10(a)(1)(B), is not

SMRH:485016877.8

considered a prohibited taking under Section 9 of the ESA. 16 U.S.C. §§ 1536(o)(2), 1539(a)(1)(B).

27.     In order to obtain an incidental take permit under ESA section 10(a)(1)(B), a habitat conservation plan (**HCP**) is required.  HCPs are designed to offset any harmful effects the taking authorized by the permit might have on the species. 16 U.S.C. § 1539. An HCP must specify, among other things, the impacts of the authorized taking, the steps that will be taken to minimize and mitigate those impacts, and the funding that will be available to implement those steps.  16 U.S.C. § 1539(a)(2)(A).

28.     In order to approve an HCP and issue an incidental take permit, the Service must find, among other things, that the applicant will minimize and mitigate the impacts of the authorized taking to the maximum extent practicable, that the applicant will ensure that adequate funding for the HCP will be provided, and that the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.  16 U.S.C. § 1539(a)(2)(B).

**Section 7 Consultation**

29.     Before approving an HCP or issuing an incidental take permit, the Service also must complete an internal consultation and prepare a biological opinion pursuant to ESA section 7, analyzing how the proposed action will affect listed species and/or critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.  In formulating its biological opinion, the Service must use the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).  ESA section 7 requires the Service to ensure that its action in approving the HCP and incidental take permit is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of the designated critical habitat of any such species. 16 U.S.C. § 1536(a)(2).

30.     Even after approving an HCP, the Service must reinitiate consultation under ESA section 7 if (among other reasons), (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that

1  may affect listed species or critical habitat in a manner or to an extent not previously

2  considered; or (3) the action is modified in a manner that causes an effect to the listed

3  species or critical habitat that was not considered in the biological opinion. 50 C.F.R.

4  § 402.16. An HCP and incidental take permit are analyzed and approved as a complete

5  package; if any conservation and management measures specified in those documents or in

6  the biological opinion fall short, then the conclusions in the biological opinion are invalid,

7  the Service must reinitiate consultation, and the ITP should be suspended or revoked. *See*

8  50 C.F.R. §§ 13.27, 13.28.

9  **FACTUAL BACKGROUND**

10  **The Plan and the ITP**

11  31.   The Plan is an HCP prepared pursuant to ESA section 10(a)(2), which covers

12  an area of approximately 460,205 acres, primarily within the County. The Plan specifies

13  the Covered Activities, including development and infrastructure construction, that will be

14  authorized by the ITP. It sets limits on impacts to various types of habitat, including

15  serpentine grassland habitat, that will be allowed within the Plan area as a result of the

16  Covered Activities.

17  32.   The Plan describes the expected impacts of the Covered Activities to nine

18  wildlife species, including BCB, and nine plant species (collectively, **Covered Species**).

19  The BCB (*Euphydryas editha bayensis*) is an insect species listed as threatened under the

20  ESA.

21  33.   The Plan includes a conservation strategy that is intended to minimize and

22  mitigate the impacts of Covered Activities on Covered Species to the maximum extent

23  practicable, and to ensure that Covered Activities will not appreciably reduce the

24  likelihood of the survival and recovery of Covered Species in the wild.

25  34.   The Plan's conservation strategy includes mandatory conservation

26  objectives, including the creation of a habitat Reserve System with a total size of at least

27  46,496 acres (including at least 33,205 acres of newly conserved land), establishment of a

28  framework and funding for perpetual management of the Reserve System, and preservation

of major connections between key habitat areas and existing protected areas.  Additional mandatory conservation objectives establish conservation requirements for specific habitat types and Covered Species.

35.    The Plan conservation strategy places particular emphasis on conserving populations and habitat of certain Covered Species that require the most protection, and/or for which conservation actions will also benefit other Covered Species.  Among the most important of these species is the BCB, which is currently known only in the Plan area, and which serves as an "umbrella" species for many serpentine plants that are also Covered Species under the Plan.  Thus, the design of the Plan's Reserve System began with determining the conservation needs of BCB.

36.    Conservation needs for BCB include preservation of serpentine grassland habitat, which supports the adult nectar plants and larval host plants that BCB requires to complete its life cycle.  Serpentine grassland along ridges, with a variety of slopes and aspects, and containing features such as stable holes, soil cracks and rock outcrops that can shelter BCB larvae, is particularly important.

37.    BCB populations within the Plan area exhibit characteristics of a metapopulation—a group of geographically distinct populations that expand and contract in size from year to year as a result of environmental factors and immigration rates.  The BCB metapopulation consists of larger, core populations, and several smaller, satellite populations.  In periods of unsuitable habitat conditions, satellite populations may become extinct, and dispersal from core populations to satellite populations in years of good habitat conditions is important for reestablishing the satellite populations (the "rescue effect").  For this reason, it is particularly important to retain and improve connectivity among prime habitat areas that support BCB populations.

38.    The primary areas of serpentine habitat within the Plan area are located on the low ridge known as Coyote Ridge, which runs along the eastern side of the Santa Clara Valley immediately east of U.S. 101, and includes Young Ranch.

39.     Coyote Ridge is critical to the Plan's conservation strategy for BCB and for rare plant species associated with BCB habitat, including the endangered Santa Clara Valley dudleya (*Dudleya setchellii*) and endangered Metcalf Canyon jewelflower (*Streptanthus albidus* ssp. *albidus*).  Coyote Ridge contain the highest quality BCB habitat in the Plan area, including extensive portions of ESA-designated critical habitat for BCB. *All* remaining core populations of BCB are located along Coyote Ridge, with a few satellite populations that are all located within a nine-mile radius.

40.     The Plan requires the acquisition and management of sufficient BCB habitat to ensure BCB occupancy of each of the four "core habitat areas" identified in the Service's 1998 Serpentine Recovery Plan (a recovery plan for BCB and other serpentine grassland species), all of which are located along Coyote Ridge: the Kirby, Metcalf, San Felipe and Silver Creek Hills areas. The Plan defines eight core habitat *units* within the four core habitat areas, and identifies some of these units as targets for conservation.

41.     Of the eight core habitat units, the Metcalf habitat unit (in the Metcalf core habitat area) and the Metcalf North Ridge habitat unit (within the San Felipe core habitat area) are, respectively, the highest-quality and the second-highest-quality habitat units for BCB.  These habitat units contain the highest-priority BCB habitat for conservation and are targets for conservation under the Plan.

42.     Young Ranch contains more than 75% (approximately 475 acres) of the Metcalf core habitat unit.  This 475 acres has been documented to support the highest density BCB population of any remaining BCB habitat unit.

43.     Young Ranch contains approximately half (108 acres) of the Silver Creek Hills Central core habitat unit, and 51 acres of the Metcalf North Ridge (aka San Felipe) core habitat unit.

44.     Loss of the BCB habitat within Young Ranch would reduce the resiliency of BCB populations, increase their vulnerability to extirpation from stochastic events, reduce connectivity with BCB habitat and populations located to the north and south of Young Ranch along Coyote Ridge, and impair the ability to maintain viable BCB populations

within the Metcalf core habitat area and the Silver Creek Hills core habitat area as required by the Plan.

45.     The Plan requires acquisition and management of land to establish Linkage 6, the habitat linkage along Coyote Ridge that connects the core BCB populations and habitat areas clustered along and adjacent to the ridge.  The Plan identifies Linkage 6 as critical to the survival and recovery of BCB and other serpentine species, including the endangered Santa Clara Valley dudleya and Metcalf Canyon jewelflower.

46.     Because of the prominent position Young Ranch occupies on Coyote Ridge, and the critical role its BCB habitat plays in connecting core BCB populations on the southern part of the ridge with those at the northern end of the ridge, Linkage 6 cannot be successfully established without including Young Ranch in the habitat Reserve System.

47.     The Plan requires the acquisition and protection of at least 900 acres of serpentine grassland within the Coyote 6 conservation analysis zone, which includes Young Ranch, and at least 2,900 acres on Coyote Ridge overall.  Young Ranch includes 675 acres of serpentine grassland (75 percent of the Coyote 6 objective), of which 633 acres supports both the larval host plants and the adult nectar plants required by BCB, and is considered BCB habitat.

48.     Young Ranch contains resources capable of satisfying approximately 61 percent of the Plan requirement for acquisition and management of seasonal wetlands, 46 percent of the Plan requirement for conservation of Metcalf Canyon jewelflower occurrences, 11 percent of the Plan requirement for conservation of Santa Clara Valley dudleya occurrences, and 7 percent to 68 percent of various other Plan conservation requirements.

49.     To conserve the high quality BCB habitat, BCB populations, and other important biological resources within Young Ranch, it is not sufficient merely to avoid development or other activities within the property.  Active management, including carefully managed grazing and other measures to control specific threats, is required.

Without grazing, habitat conversion invariably leads to loss of the serpentine grassland habitat that BCB requires and to extinction of BCB populations.

50.     In order to ensure the long-term active management necessary to conserve the BCB habitat and other resources within Young Ranch, the majority of Young Ranch must be acquired and managed within the Plan's habitat Reserve System.

51.     The Service's analysis of the ITP's effects on Covered Species, in the Biological Opinion, is explicitly premised "on the basis of the entire Plan being implemented," including those mandatory elements of the conservation strategy that depend on the inclusion of Young Ranch within the Plan's habitat Reserve System.

52.     Among other assumptions, the Plan and the Biological Opinion assume that Young Ranch and other properties containing important conservation resources will be available for conservation and will be acquired and managed within the Plan's habitat Reserve System.

53.     The Plan and the Biological Opinion rely on landscape-level modeling of habitat for Covered Species to determine that there is sufficient habitat available to meet the Plan's conservation requirements.  YCS has submitted information demonstrating that the Plan's modeling is inaccurate and, in many cases, overestimates the amount of Covered Species habitat available within the Plan area.

54.     The Plan and the Biological Opinion assume that the total cost of Plan implementation will be approximately $564 million, which will be funded primarily through development fees (or in-lieu land dedication) assessed on permitted development within the Plan area.

55.     The Plan states that the most significant threat to BCB and its habitat is nitrogen deposition and lack of management to minimize the effects of nitrogen deposition, leading to habitat conversion.  This conclusion is based on a technical study that projects future increases in nitrogen deposition, primarily due to emissions of nitrogen oxides (NOx) from increased vehicle traffic.

**Procedural History of the Plan**

56.     The County, the City of San Jose, the City of Gilroy, the City of Morgan Hill, the Santa Clara Valley Transportation Authority and the Santa Clara Valley Water District submitted applications to the Service for the ITP in November and December 2010.  The Service published a Notice of Availability for the Draft Environmental Impact Statement (**EIS**), Plan, and Implementing Agreement in the Federal Register on December 17, 2010 (75 FR 79013), and a Notice of Availability for the Final EIS, Plan, and Implementing Agreement in the Federal Register on August 31, 2012 (77 FR 53221).

57.     YCS participated actively in the Service's development of the Plan.  YCS joined the Plan stakeholder group and submitted to the Service detailed resource studies of Young Ranch that YCS had commissioned at its own expense, including extensive multi-year surveys for BCB and sensitive habitats, as well as baseline studies for other biological resources, geology, archaeology, and topography.

58.     YCS also submitted extensive written comments on the Plan to the Service, including a comment letter dated April 18, 2011 (**2011 Comment Letter**).  In the 2011 Comment Letter, YCS pointed out several flaws in the Plan's conservation strategy and its analysis of impacts to Covered Species, including: (i) the Biological Opinion relies on inaccurate, landscape-level modeling to overstate the amount of habitat for Covered Species available for conservation; (ii) the Plan relies on mitigation measures, including acquisition and management of habitat, that are speculative and not certain to occur; (iii) the applicants have not ensured that adequate funding for the Plan will be provided; and (iv) the Plan's analysis of impacts to serpentine grassland habitat from nitrogen deposition is flawed.

59.     Without correcting the flaws identified by YCS, the Service issued the Biological Opinion on April 10, 2013.

60.     The Biological Opinion concludes that the Service's issuance of the ITP, authorizing implementation of the Plan, is not likely to jeopardize the continued existence

of any Covered Species or result in the destruction or adverse modification of critical habitat for such species.

61.    The Biological Opinion's incidental take statement incorporates the Plan's entire conservation strategy, management program and conditions on Covered Activities, together with the terms and conditions described in the Plan Implementing Agreement and the ITP, as mandatory, non-discretionary terms and conditions that "must be undertaken" in order for the take exemptions of the ITP to apply.

62.    The Biological Opinion states that reinitiation of formal consultation under ESA section 7 will be required in the event the conditions specified in 50 C.F.R. § 402.16 are met.

63.    On July 30, 2013, the Service issued the ITP.  The ITP is valid for a term of 50 years, through July 30, 2063.

64.    The ITP authorizes take of the five wildlife Covered Species currently listed as endangered or threatened under the ESA, including BCB, by the six original applicants and the Santa Clara Valley Habitat Agency, which is responsible for implementation of the Plan (collectively, the **Permittees**).  The ITP states that take authorization is subject to full compliance with, and implementation of, the Plan, including the conservation and mitigation, monitoring and management measures described therein.

**The Service's Failure to Reinitiate Consultation**

65.    Long-term conservation and management of Young Ranch is not possible without the County's approval of limited development on a small portion of the property. This development is necessary to provide an economic foundation for dedicating the balance of Young Ranch and its high-quality BCB resources to the Reserve System, while providing YCS with a reasonable return on its investment in the property.  Absent some economically viable development of the property, it is also not economically sustainable for YCS to continue grazing Young Ranch, at a net financial loss, to maintain and enhance BCB habitat.

66.     In August 2014, YCS and the County entered into a Settlement Agreement to resolve YCS's state court litigation challenging the County's inadequate environmental review for the Plan under the California Environmental Quality Act (**CEQA**) (the **Settlement Agreement**).  The Settlement Agreement created a framework to implement the development and conservation of Young Ranch to implement the Plan: YCS would carry out reasonable development of a small portion of the property that lacked high-quality BCB habitat, which would enable YCS to dedicate the balance of the property to the Reserve System to meet the Plan's conservation goals.

67.     As part of the Settlement Agreement, the County represented to YCS that the County's General Plan did not preclude implementation of the proposed conservation and development strategy and that the City would not exercise approval authority over the proposal.

68.     Consistent with the Settlement Agreement, in December 2014 and January 2015, YCS applied to the County for approval of a 79-lot residential project on Young Ranch.  The proposed project would have allowed development of less than 200 acres of the property, and resulted in dedication of at least 1,950 acres to the Reserve System, including nearly all of the BCB habitat within Young Ranch.

69.     The County elected to prepare an Environmental Impact Report (**EIR**) for the project to comply with CEQA.  YCS did not have an opportunity to review the EIR until the County completed it and released it to the public.  When released, the EIR contained conclusions, contrary to the Settlement Agreement, that the project's strategy of relying on conservation of portions of Young Ranch within the City to meet the County's open space requirements was inconsistent with density and open space policies in the County's General Plan.

70.     Under California and local law, the County may not lawfully approve a development project that conflicts with its General Plan.  Thus, the analysis contained in the EIR would preclude approval of the proposed project, or of *any* comparable project

1  that would fund the dedication of BCB habitat within Young Ranch to meet the Plan's
2  conservation objectives.

3      71.     When YCS confronted the County about the unexpected conclusions in the
4  EIR, the County disclaimed the representations it had made to YCS in the Settlement
5  Agreement.  This forced YCS to file a lawsuit against the County for declaratory relief,
6  seeking judicial interpretation of the Settlement Agreement.  (*YCS Investments, Inc. v. The*
7  *County of Santa Clara,* Santa Clara County Superior Court, Case No. 17CV311946.)
8  After filing the lawsuit, YCS obtained evidence in discovery showing that the County had
9  made false representations in the Settlement Agreement and had colluded with the City to
10 block the proposed project and any future development on Young Ranch.

11     72.     The new information obtained by YCS demonstrates that the County has
12 determined to prevent any economically viable development of Young Ranch.  Absent
13 such development, it will not be feasible for YCS to dedicate the majority of Young Ranch
14 to the Reserve System so that it can be managed consistent with the Plan's conservation
15 goals.  It also will not be economically viable for YCS to continue existing grazing and
16 management practices, at a financial loss, to maintain BCB habitat on Young Ranch, or to
17 fund enhancement and restoration activities in areas where BCB habitat has already been
18 degraded.

19     73.     Without active management, including grazing, prime BCB habitat on
20 Young Ranch will be lost to habitat conversion and invasive species, ultimately leading to
21 the extinction of BCB populations within the property.

22     74.     As a result of the County's actions, it will not be possible to achieve the
23 Plan's mandatory conservation objectives for BCB and other species, including the
24 objectives of establishing Linkage 6 and ensuring continued BCB occupancy of all four
25 BCB core habitat areas on Coyote Ridge.

26     75.     YCS submitted a letter to the Service, dated January 25, 2019, informing it
27 of this new information showing that the Service's approval of the Plan may affect listed
28 species and their critical habitat in a manner, and to an extent, not considered in the

Service's biological opinion for the Plan, and stating that the Service must reinitiate consultation regarding the Plan under Section 7 of the Endangered Species Act, and consider amendment of the Plan.

76. The Service did not respond to the January 25, 2019 letter nor reinitiate consultation.

77. Accordingly, on February 6, 2019, YCS submitted its 60-day notice of intent to sue. (*See* Exhibit 1.)

78. The Service did not respond to the 60-day notice. Defendants have not taken any action to remedy Defendants' violations of law.

## FIRST CAUSE OF ACTION

### Reliance on Speculative Mitigation Measures

### (ESA, 16 U.S.C. §§ 1536, 1539; Alternatively, APA, 5 U.S.C. § 706)

79. Plaintiffs re-allege Paragraphs 1 through 78, and incorporate those paragraphs herein as if set forth in full.

80. The APA provides that a court must hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Service's issuance of the Biological Opinion and approval of the ITP and Plan are "final agency action" within the meaning of the APA.

81. When the Service relies on mitigation measures included in an HCP to find that the HCP complies with the requirements of ESA section 10, the mitigation measures must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise enforceable obligations, and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)). The Service violates the APA when it relies on mitigation measures that are not "reasonably certain to occur." *Nat'l Wildlife Feder. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917,

935–936 (9th Cir. 2008); *see also Sierra Club v. Marsh*, 816 F.2d 1376, 1387–1388 (9th Cir. 1987).

82.     The Plan depends on the mandatory conservation goals and objectives of its conservation strategy, including the establishment of Linkage 6 and the acquisition and management of habitat to ensure continued BCB occupancy of each of the four BCB core habitat areas on Coyote Ridge, to mitigate impacts of Covered Activities on listed species and ensure the requirements of ESA section 10 are met.

83.     Inclusion of Young Ranch, and other key conservation lands, within the Plan's Reserve System is essential to meet the mandatory conservation goals and objectives of the Plan's conservation strategy.

84.     The Biological Opinion assumes, without adequate supporting evidence in the record, that Young Ranch and other properties will be available to satisfy the Plan's conservation requirements and will be added to the Reserve System.  As a result, the Plan relies on mitigation measures that are speculative and not reasonably certain to occur.  The assumed conservation benefits to the Covered Species are unlikely to be realized.

85.     The Service's issuance of the Biological Opinion and approval of the Plan and ITP, in reliance on the speculative mitigation measures contained in the Plan, therefore violated the ESA, 16 U.S.C. §§ 1536, 1539, and the APA, 5 U.S.C. § 706.

**SECOND CAUSE OF ACTION**

**Reliance on Flawed Habitat Modeling**

**(ESA, 16 U.S.C. §§ 1536, 1539; Alternatively, APA, 5 U.S.C. § 706)**

86.     Plaintiffs re-allege Paragraphs 1 through 85, and incorporate those paragraphs herein as if set forth in full.

87.     The ESA requires the Service to use the "best scientific and commercial data available" and to provide a rational basis for its findings regarding the Plan's impacts and the effectiveness of the Plan's conservation strategy. 16 U.S.C. §§ 1536(a)(2), 1539(a)(2)(B).  The APA likewise requires a court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).  The Service's issuance of the Biological Opinion and approval of the ITP and Plan are "final agency action" within the meaning of the APA.

88.     The Plan relies on landscape-level modeling of land cover types and habitats to estimate the amount of habitat and resources for Covered Species available for conservation within the Plan area.  But the Plan relies on flawed and inadequate information, leading it to overstate the habitat and resources available for conservation. Specifically, the land cover mapping lacks fine enough detail to accurately characterize many land cover types, and the Plan's habitat models are not sufficiently detailed to accurately reflect the extent of habitat for Covered Species.  The habitat models rely on large mapping units, are unable to identify certain habitat features, and provide an inadequate degree of resolution for certain habitat features.  Without limitation, the following are examples of these flaws:

a.     The draft Plan mapping assumed 915 acres of serpentine grassland on Young Ranch, while site-specific investigation demonstrated the presence of approximately 675 acres.

b.     The Draft Plan model estimated that Young Ranch supported 991 acres of BCB habitat, while site-specific surveys on Young Ranch showed that the property actually supports 633 acres of BCB habitat.

c.     The Plan's California tiger salamander habitat model overstates available breeding habitat by including sites that do not meet ponding requirements necessary to support breeding, and it overstates available upland/refugia habitat by assuming that salamanders will use areas up to 1.3 miles away from breeding ponds when best available science shows they will only travel up to 0.7 miles.  The California tiger salamander (Central California DPS) is a Covered Species and is listed as threatened under the ESA.

d.     The Plan's foothill yellow-legged frog habitat model overstates available habitat by assuming that frogs can use all stream types, including intermittent and

ephemeral streams, when the best available science shows that the species requires perennial streams.  The foothill yellow-legged frog is a Covered Species and is a candidate for listing under the ESA.

89.     Although YCS identified these flaws in the 2011 Comment Letter, the Service continued to rely on the flawed modeling and, when provided with more accurate data for specific properties, incorporated that data selectively or not at all.

90.     The Service's analysis of the Plan and ITP relies upon its overstated estimates of available habitat to conclude that it is feasible to achieve the habitat conservation goals of the Plan and adequately mitigate the impacts of Covered Activities to ESA-listed species.

91.     The Service's issuance of the Biological Opinion and approval of the Plan and ITP, without using the best available information and without a rational basis, therefore violated the ESA, 16 U.S.C. §§ 1536, 1539, and the APA, 5 U.S.C. § 706.

**THIRD CAUSE OF ACTION**

**Failure to Ensure Adequate Funding for Plan Implementation**

**(ESA, 16 U.S.C. §§ 1536, 1539; Alternatively, APA, 5 U.S.C. § 706)**

92.     Plaintiffs re-allege Paragraphs 1 through 91, and incorporate those paragraphs herein as if set forth in full.

93.     Under the ESA, the Service may not approve an incidental take permit and related HCP unless it finds that the applicant has ensured adequate funding for the HCP. 16 U.S.C. § 1539(a)(2)(B)(iii).

94.     Here, the Permittees failed to ensure adequate funding for the Plan because (1) the Plan underestimates the acquisition costs of mitigation lands; (2) the Plan relies on state and federal funding sources that are likely to be reduced due to budgetary constraints; (3) the projected funding assumes a level of development (and thus development fees) that may not occur; and (4) the proposed development fees may not be enforceable given the lack of reasonable nexus to development impacts.

95.     The Service's approval of the Plan and ITP, without ensuring adequate funding for the Plan, therefore violated the ESA, 16 U.S.C. §§ 1536, 1539, and the APA, 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION

### Reliance on Flawed Analysis of Nitrogen Deposition

### (ESA, 16 U.S.C. §§ 1536, 1539; Alternatively, APA, 5 U.S.C. § 706)

96.     Plaintiffs re-allege Paragraphs 1 through 95, and incorporate those paragraphs herein as if set forth in full.

97.     The ESA requires the Service to use the "best scientific and commercial data available" and to provide a rational basis for its findings regarding the Plan's impacts and the effectiveness of the Plan's conservation strategy. 16 U.S.C. §§ 1536(a)(2), 1539(a)(2)(B).  The APA likewise requires a court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Service's issuance of the Biological Opinion and approval of the ITP and Plan are "final agency action" within the meaning of the APA.

98.     The Plan states that the most significant threat to BCB and its habitat is nitrogen deposition and lack of management to minimize the effects of nitrogen deposition, leading to habitat conversion.  This conclusion is based on a technical study that projects future increases in nitrogen deposition, primarily due to emissions of NOx from increased vehicle traffic.

99.     The technical study relies on a flawed methodology and fails to account for best available data on NOx emissions.  For example, the technical study fails to account for the Clean Air Plan adopted by the Bay Area Air Quality Management District, which projects a decline in NOx emissions rather than an increase.

100.    Although YCS pointed out these flaws in the 2011 Comment Letter, and although the Service updated the technical study before adopting the Plan, the Service did not adequately correct or address the methodology.

101.   As a result of the flawed methodology for analyzing nitrogen deposition and its impacts to Covered Species and their habitat, the Plan and the Biological Opinion fail to accurately assess the threats to Covered Species within the Plan area and the measures necessary to ensure their conservation.  As a result, the Service's findings that its issuance of the ITP is not likely to jeopardize the continued existence of any ESA-listed species, 16 U.S.C. § 1536(a)(2), and that the authorized taking will not appreciably reduce the likelihood of the survival and recovery of any such species in the wild, 16 U.S.C. § 1539(a)(2)(B), are arbitrary and capricious.

102.   The Service's issuance of the Biological Opinion and approval of the Plan and ITP, in reliance on the flawed methodology, therefore violated the ESA, 16 U.S.C. §§ 1536, 1539, and the APA, 5 U.S.C. § 706.

**FIFTH CAUSE OF ACTION**

**Failure to Reinitiate Consultation (ESA, 16 U.S.C. § 1536; 50 C.F.R. § 402.16)**

103.   Plaintiffs re-allege Paragraphs 1 through 102, and incorporate those paragraphs herein as if set forth in full.

104.   The ESA requires the Service to reinitiate formal consultation when, among other reasons, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16.

105.   The Service's analysis of effects to Covered Species from issuance of the ITP is premised on full implementation of the Plan's conservation strategy to minimize and mitigate the effects of authorized take.  Young Ranch is essential to fully implementing the Plan's conservation strategy and realizing benefits that are critical to the survival of BCB and other Covered Species, including those that flow from establishing Linkage 6, ensuring BCB occupancy of the Metcalf and Silver Creek Hills core habitat areas, and maintaining large blocks of high quality, connected serpentine grassland habitat along Coyote Ridge.

106.   The new information showing that Young Ranch cannot be incorporated into the Reserve System, because of the County's actions, necessarily reveals that the Service's action may affect listed species or critical habitat in a manner and to an extent not previously considered.

107.   In particular, the new information calls into question the Service's findings that the ITP and Plan are not likely to jeopardize the continued existence of any listed species or to result in the destruction or adverse modification of any designated critical habitat for such species, 16 U.S.C. § 1536(a)(2), and that the taking authorized by the ITP will not appreciably reduce the likelihood of the survival and recovery of the species in the wild, 16 U.S.C. § 1539(a)(2)(B)(iv).

108.   Given this new information, the Service was required to reinitiate consultation to reconsider its Biological Opinion and findings, and to consider amendment of the Plan and ITP to ensure that its action complies with the ESA.

109.   The Service's failure to timely reinitiate consultation violates the ESA and implementing regulations.  16 U.S.C. §§ 1536(a)(2), (b)(1)(A), (b)(3), (b)(4); 50 C.F.R. § 402.16.  In addition, by allowing, authorizing, or approving projects and activities to proceed within the Plan area that may affect BCB and/or other Covered Species, prior to the reinitiation of and completion of consultation, the Service is violating the ESA. 16 U.S.C. § 1536(a)(2), (d); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1056 (9th Cir. 1994).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue an order

A.   Declaring that the Biological Opinion, and the Service's approval of the ITP and the Plan, are invalid because they violate the APA and/or the ESA;

B.   Enjoining Defendants from implementing the Plan, authorizing the Covered Activities, or otherwise acting pursuant to the Plan or the ITP, and remanding the Biological Opinion and ITP to the Service for reconsideration;

1          C.        Requiring the Service to reinitiate consultation under ESA section 7 on its

2  approval of the Plan and the ITP;

3          D.        Awarding Plaintiffs attorneys' fees and costs to the extent permitted by law;

4  and

5          E.        Granting such other relief as the Court deems just and proper.

6  Dated:  San Francisco, California, April 9, 2019

7                                             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

8

9                              By        _____
                                                    s/ Alexander L. Merritt
10                                             PHILIP F. ATKINS-PATTENSON
                                                ARTHUR J. FRIEDMAN
11                                                 JAMES F. RUSK
                                             ALEXANDER L. MERRITT
12

13                                           Attorneys for PLAINTIFFS YCS
                                                INVESTMENTS ET AL.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. _____
SMRH:485016877.8                         COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF